UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MARIO FRANCISCO GOMEZ, JR.,

    Defendant.

Case No. 15-cr-20087
Honorable Laurie J. Michelson
Magistrate Judge Mona K. Majzoub

**AMENDED OPINION AND ORDER
DENYING DEFENDANT'S MOTION TO VACATE SENTENCE [164]**

Mario Gomez was a passenger in a car in which Michigan State Police troopers found three kilograms of methamphetamine. At trial, the government's theory was that both Gomez and the driver of the car were couriers for a drug transaction planned near Detroit. The defense theory was "mere presence"—that Gomez had joined the trip to pursue legitimate business opportunities in Michigan, and that he was unaware drugs were in the car. A jury thought otherwise, finding Gomez guilty of conspiracy to possess with intent to distribute methamphetamine and possession with intent to distribute methamphetamine. The Sixth Circuit affirmed his conviction, and he now moves to vacate his sentence pursuant to 28 U.S.C. § 2255. For the reasons that follow, Gomez is not entitled to relief.

**I.**

In January 2015, after observing some minor traffic offenses, Michigan State Police Trooper Ben Sonstrom stopped a car containing Mario Gomez and Matias Silerio. (ECF No. 127, PageID.587.) The pair had left Texas the day before, driving over 1,500 miles in 32 hours. (ECF

No. 127, PageID.562.) When the trooper asked Gomez and Silerio to account for their long trip, the pair offered conflicting explanations. (ECF No. 127, PageID. 597, 598, 601, 639.)

## A.

The trial testimony of several co-conspirators shed light on why the men made the trip: to deliver a significant amount of crystal meth to a buyer in Detroit. Bertha DelaGarza testified that the supplier for the drugs at the center of the conspiracy was a man named "Gordo" in Guadalajara, Mexico. (R. 129, PID 912–15.) She said she introduced Gordo to Juan Mendoza-Castillo, who had a buyer in Detroit looking for crystal meth. (R. 129, PID 914.) According to DelaGarza, by January 2015, Mendoza-Castillo and Gordo had arranged to ship crystal meth to Detroit. (R. 129, PID 915.) Importantly, she testified that she understood that Gordo had arranged for his two usual crystal meth couriers to transport the drugs. (R. 129, PID 915-16, 20.)

And she believed at least one of them had either a familial connection to Gordo or owned the drugs. (ECF No. 129, PageID.926–928.)

So Mendoza-Castillo could collect his finder's fee, he arranged for Denise Alvarado to fly to Detroit to receive the money after the drug transaction (and then take it back to Texas). (*Id*. at PageID.858–860, 918.) For his part, Mendoza-Castillo had no idea who the couriers were. (ECF No. 129, PageID.864.) But DelaGarza gave him a phone number to reach the couriers, and Mendoza-Castillo was in communication with them via phone and text before and after they left. (ECF No. 129, PageID.864–868.) Mendoza-Castillo even tracked their progress north and texted the couriers an address in Canton, Michigan where they would meet Guerro. (ECF No. 129, PageID.867–868.)

The couriers left Texas on January 28, 2015 and were supposed to arrive in Canton on January 29. (ECF No. 129, PageID.878.) But by evening on January 29, neither Mendoza-Castillo

nor Alvarado could reach the couriers. (ECF No. 129, PageID.868–869.) Later, DelaGarza found out from Gordo that the couriers had been arrested (ECF No. 129, PageID.926.)

Earlier in the day on January 29, Sonstrom stopped Gomez and Silerio on I-275 near Canton. The pair gave Sonstrom reason to become suspicious. (ECF No. 127, PageID.601.) Silerio told Sonstrom the pair were headed to Canton, Michigan to purchase a tractor or an excavator. (ECF No. 127, PageID.639.) Gomez said he had no idea where they were headed, but he thought the pair were looking for kitchen equipment or maybe construction equipment. And the pair offered different explanations for who owned the car in which they were riding. (ECF No. 127, PageID.588.)

Sonstrom asked if there were drugs in the car. (ECF No. 127, PageID.602.) Gomez said no and consented to a search. (ECF No. 127, PageID.602, 623–624.) In short order, a dog alerted to the presence of drugs. (ECF No. 127, PageID.610.) And after an exhaustive search of the car, troopers found three kilograms of methamphetamine hidden in a compartment above the driver's side rear wheel. (ECF No. 127, PageID.609–610.) All of the above was captured on Sonstrom's dashcam and shown to the jury. (ECF No. 127, PageID.602, 605, 610.)

**B.**

Silerio and Gomez were arrested. (ECF No. 127, PageID.642.) After their arrest, the state police turned the pair over to the DEA. (ECF No. 127, PageID.673–674.) It turned out Mendoza-Castillo's drug-trafficking activity had been the subject of a long-running DEA investigation. (ECF No. 127, PageID.670–671.) DEA Agent Michael Brouillard interrogated Gomez. (ECF No. 127, PageID.674.) Brouillard said Gomez did not attempt to explain why he travelled to Michigan. (ECF No. 128, PageID.694.) But Brouillard did remember Gomez saying, "I want to help [myself], but I don't want to get myself in trouble." (ECF No. 128, PageID.695.) And Gomez said his brother

3

was a DEA agent. (ECF No. 128, PageID.698.) It turned out Gomez's brother was not a DEA agent, exactly, but a DEA telecommunications analyst. (ECF No. 128, PageID.697.) Even so, Brouillard interpreted Gomez's comment as a plea for leniency. (ECF No. 128, PageID.698–699.) Beyond that, Gomez remained silent. (ECF No. 128, PageID.699.) So Brouillard concluded the interrogation.

The DEA also seized Gomez's and Silerio's cellphones. (ECF No. 128, PageID.700, 703, 811.) Silerio's phone contained texts and calls to and from Mendoza-Castillo's phone. (ECF No. 127, PageID.659–62.) On January 28, Mendoza-Castillo texted Silerio an address near I-275 and Ford Road in Canton, Michigan. (ECF No. 128, PageID.704–705.) There, Mendoza-Castillo said Silerio could expect to meet Guerro and Alvarado (known to Silerio only as "the lady"). (ECF No. 128, PageID.706, 710.) On January 29, Silerio and Mendoza-Castillo exchanged texts tracking the couriers' progress north. (ECF No. 128, PageID.707–709.) For his part, Gomez's phone did not have any contact with Mendoza-Castillo. But it did have a navigation app, and only one entry in the app was for an address outside Texas. (ECF No. 128, PageID.816–818.) The non-Texas address was 275 Ford Road, Carleton, MI. (ECF No. 128, PageID.815; *see also* ECF No. 142-5, PageID.1228.) And other than the Ford Road address, Gomez's phone had no connections with Michigan. He had no 313 or 248 contacts, no calls to or from 313 or 248 numbers, no searches for Michigan businesses, and no other Michigan addresses entered into his search history or navigation app. (ECF No. 128, PageID.816–818.)

## C.

Gomez was ultimately charged with possession with intent to distribute 50 grams or more of methamphetamine and conspiracy to do the same. (ECF No. 59.) He went to trial. And at trial, the jury heard from DelaGarza, Mendoza-Castillo, and Alvarado. They also heard from Sonstrom

4

and Brouillard. They saw the video of the traffic stop, the text messages from Mendoza-Castillo to Silerio, and the record of addresses entered into Gomez's navigation app.

**D.**

Gomez mounted a defense. Gomez wanted the jury to believe Silerio was the drug courier and Gomez had no idea. (ECF No. 127, PageID.569.) Why else would Gomez have consented to a search of the car? (*Id.*) Plus, Gomez's prints were not on the drugs, nor were they anywhere near the place in the car where the drugs turned up. (ECF No. 127, PageID.572.) Instead, Gomez insisted he was a legitimate importer/exporter in the wrong place at the wrong time. (ECF No. 127, PageID.569–571.) Gomez said he knew Silerio through a business connection and so Gomez thought he was on a business trip. (*Id.*) The trip's purpose was to purchase equipment, any equipment, at a low price so Gomez could flip it for a profit. (ECF No. 127, PageID.570–571.)

To attempt to bolster his version, Gomez had his wife testify. Gomez's wife said Gomez owned his own import/export business. (ECF No. 130, PageID.1011.) Gomez's business imported/exported all types of items, from kitchen equipment to latex sheets to steel tubes to fabrics to bowling alley cleaner. (ECF No. 130, PageID.1015, 1016, 1019, 1020, 1038.) To build the business, Gomez's wife said her husband made frequent out-of-state trips for products to import/export. (ECF No. 130, PageID.1013.) Maybe 20 out-of-state trips per year. Or maybe five, or maybe 10. (ECF No. 130, PageID.1013–1014.) And Gomez's wife said her husband's business trips did not always start with a customer or client contact. (ECF No. 130, PageID.1014.) Instead, she said, her husband sometimes learned of items to purchase by looking at "magazines and brochures that they have at the gas stations regarding construction equipment and stuff like that." (*Id.*) But prior to January 2015, none of the out-of-state trips had ever involved Matias Silerio. (ECF No. 130, PageID.1037.)

5

**E.**

Despite Gomez's defense, the jury returned guilty verdicts on both counts. (ECF No. 130, PageID.1137.) Gomez received the mandatory minimum sentence of 120 months. (ECF No. 156, PageID.1467.) And the Sixth Circuit affirmed both conviction and sentence. *See United States v. Gomez*, No. 17-1194, 2017 U.S. App. LEXIS 21424, at *12 (6th Cir. Oct. 26, 2017).

Now Gomez moves to vacate his sentence pursuant to 28 U.S.C. § 2255. (ECF No. 164.) Because the motion, record of prior proceedings, and governing law "conclusively show that [Gomez] is entitled to no relief[,]" a hearing is not necessary. 28 U.S.C. § 2255(b); Rules Governing § 2255 Cases, Rule 4(b).

**II.**

A federal prisoner may challenge his sentence by way of a motion filed pursuant to 28 U.S.C. § 2255. To prevail, Gomez must show that the sentence imposed is "in violation of the Constitution or laws of the United States," or "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "A prisoner seeking relief under 28 U.S.C. § 2255 must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496–97 (6th Cir. 2003)).

**III.**

Gomez makes three arguments. Primarily, he points to multiple times at trial where he thinks his lawyer provided ineffective assistance. Gomez also believes the government suborned perjury from one of their witnesses. And Gomez raises a claim of cumulative error.

**A.**

Consider, first, Gomez's ineffective-assistance claims. For those accused of a crime, the Sixth Amendment ensures a right to counsel. U.S. Const. amend. VI. And the right to counsel means "reasonably effective assistance" of a lawyer. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show that a lawyer's representation amounted to less than "reasonably effective assistance," Gomez must establish deficient performance and prejudice. *Id.* at 694. Deficient performance means his lawyer's representation fell below an objective standard of reasonableness. *Id.* at 694. Prejudice means there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*

**1.**

Gomez thinks his lawyer should have challenged a portion of the government's closing. In closing, the government argued Gomez's import/export business was a front. (ECF No. 130, PageID.1050.) And as part of that argument, the government said:

> It is not often that Defense counsel and the Government agrees on something, but every now and then we agree on one or two things. The one thing we do agree upon here, he was in the business of importing drugs. That's his business. That's his business. And this is the reason why we know so.

(ECF No. 130, PageID.1051.) Gomez homes in on the government's assertion that everyone agreed Gomez was in the business of importing drugs. Gomez says his lawyer should have either objected to that assertion at the time or countered it in his own closing. Either way, leaving it unchallenged, says Gomez, gave the jury the impression that Gomez did not contest his role as a drug courier.

Gomez's argument is unpersuasive. True, Gomez's lawyer decided not to object to the government's closing. But the decision not to object appears strategic. *See Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003); *Hanna v. Ishee*, 694 F.3d 596, 612 (6th Cir. 2012). All trial, Gomez's

7

lawyer cross-examined the witnesses and sought to establish that Gomez was not part of the drug transaction. He also delivered a strong closing. The closing demonstrated a thorough understanding of the evidence admitted and the government's theory of the case. And Gomez's closing gave the jury reason to think Gomez really was on a legitimate business trip, reason to doubt the credibility of Mendoza-Castillo, Alvarado, and DelaGarza, and reason to believe only Silerio was involved in drug trafficking. (ECF No. 130, PageID.1066–1086.) And at the end, Gomez's lawyer urged the jury to return a verdict of not guilty, a clear sign Gomez did not concede his role as a drug courier. (ECF No. 130, PageID.1086.) Counsel also knew the jury was going to be instructed again that lawyer argument is not evidence. So on this claim, even though Gomez's lawyer did not take the strategic tack Gomez now wishes he had, Gomez cannot establish deficient performance.

**2.**

Next Gomez says his lawyer did a poor job cross-examining Denise Alvarado. Recall that Alvarado flew to Michigan to retrieve the drug proceeds for Mendoza-Castillo. Alvarado testified that Mendoza-Castillo told her to expect a man named Mario to bring the drugs to Michigan. And she said Mendoza-Castillo showed her a picture of Mario, which Alvarado said matched Gomez. (ECF No. 130, PageID.969.) However, recall, too, that Mendoza-Castillo told the jury he had no idea who the couriers were. Gordo arranged the couriers. Mendoza-Castillo only had a phone number for them, obtained from DelaGarza. So Gomez says his lawyer should have done more to expose Alvarado as a liar, including using her cooperation agreement against her, using Mendoza-Castillo's statements against her, and challenging her to produce the alleged picture of Mario.

Even if Gomez's lawyer did not cross Alvarado exactly as Gomez now wishes, Gomez cannot establish deficient performance. *See Moss v. Olson*, 699 F. App'x 477, 486-87 (6th Cir.

8

2017) ("Where . . . trial counsel conducts a thorough and meaningful cross-examination of a witness, counsel's failure to employ a trial strategy that, in hindsight, might have been more effective does not constitute unreasonable performance for purposes of an ineffective assistance of counsel claim.").

Gomez's lawyer attacked Alvarado's credibility. First, Gomez's lawyer highlighted inconsistencies in Alvarado's testimony. (ECF No. 129, PageID.965.) On direct Alvarado said she was told to expect a man named Mario. (*Id.*) But on cross Alvarado said she was only shown a picture of the man. (*Id.*) In addition to establishing an inconsistency in Alvarado's testimony, Gomez's lawyer also introduced a prior inconsistent statement. (ECF No. 129, PageID.965–966.) Counsel established that before testifying against Gomez, Alvarado had agreed to cooperate truthfully. (ECF No. 129, PageID.964.) And at that time, Alvarado told an agent that she had no idea who was bringing the drugs. (*Id.*) Gomez's lawyer confronted Alvarado on her changing story. (ECF No. 129, PageID.965.) And after he refreshed her recollection with the agent's report, containing the statement, (*id.*), Alvarado admitted she told the government she had no idea who was bringing the drugs.[1] (*Id.*) Finally, Gomez's lawyer got Alvarado to admit she would do anything to help herself. (ECF No. 129, PageID.968.) All told, Gomez's lawyer effectively impeached Alvarado. Gomez cannot establish deficient performance.

**3.**

Gomez's next issue with his lawyer has to do with defense strategy. Gomez wanted his lawyer to do a better job establishing that Gomez made enough money legally so that Gomez did

---

[1] Later, in the defense case, Gomez's lawyer called DEA Agent Broulliard to confirm that Alvarado previously said she did not know who she was supposed to meet and that Agent Broulliard had shown her a picture of Gomez and she could not identify him. (ECF No. 130, PageID.1007).

9

not have any motivation to make money illegally. At trial, Gomez admitted evidence of the family's finances through his wife's testimony. Financial records established that the Gomez's reported an income of around $36,000. Now, however, Gomez thinks that income might have been too low to persuade the jury Gomez lacked any financial incentive to distribute drugs. So Gomez says his lawyer should have asked Mrs. Gomez about another business Gomez says the couple apparently operated in Mexico. Gomez thinks if the jury learned the Gomez's earned more money, then he would not have been convicted.

Strategic and tactical decisions by defense counsel are difficult to challenge. *See Buell v. Mitchell*, 274 F.3d 337, 359 (6th Cir. 2001); *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). There is no deficient performance if the decisions are reasonable and "'within the range of logical choices an ordinarily competent attorney' would consider 'as reasonable to achieve a specific goal.'" *Cone v. Bell*, 243 F.3d 961, 968 (6th Cir. 2001), *rev'd on other grounds*, *Bell v. Cone*, 535 U.S. 685 (2002). And Gomez "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 687 (internal quotations omitted).

Gomez's lawyer crafted a sound strategy to achieve a specific goal. Gomez's lawyer tried to convince the jury Gomez was a legitimate businessman on a legitimate business trip. To make the strategy work, Gomez needed to explain why a legitimate, Texas businessman drives 1,500 miles, overnight, to a place where he has no evidence of any business or personal contacts (and his only apparent connection is an address suspiciously close to one connected to the drug transaction). So Gomez's lawyer called Mrs. Gomez. And Mrs. Gomez explained that her husband frequently travelled to purchase things and sometimes the business required out-of-state trips. And Gomez's lawyer used Mrs. Gomez to admit the Gomezes' recent tax information. (ECF No. 130,

PageID.1034–1035.) Combined, Gomez's defense strategy allowed the jury to infer Gomez earned legitimate business income.

Moreover, Gomez's lawyer made a sound strategic decision not to delve too deep into the Gomezes' income. To appreciate the soundness, some context is necessary. In part, the government's argument all along was that Gomez could be making good money and still be a drug dealer. (See, e.g., ECF No. 130, PageID.999.) And the Gomezes' tax records established their reported income. So highlighting unreported income from some business in Mexico would not have rebutted the government's theory and would have raised more questions than it answered. Thus, Gomez's lawyer made a reasonable decision not to push Mrs. Gomez on the family's income.

And to the extent Gomez thinks his lawyer should have conducted a more searching direct examination of Mrs. Gomez, again, Gomez's lawyer made a sound tactical decision. Mrs. Gomez was not the strongest witness. For example, when explaining her husband's approach to running their business, she said Gomez often learned of construction equipment to purchase by reading brochures and magazines he happened to find at gas stations, an assertion the government effectively attacked on cross. (*See* ECF No. 130, PageID.1040.) And Mrs. Gomez said her husband had never previously conducted an out-of-state business trip with Silerio, evidence allowing the jury to infer the Michigan trip was not a legitimate business trip. In short, plausibly appreciating the risks of having Mrs. Gomez continue, Gomez's lawyer reasonably decided to limit the scope of Mrs. Gomez's direct.

**4.**

In hindsight, Gomez wishes his lawyer had done more. Gomez believes his lawyer should have shown the jury pictures of kitchen equipment Gomez had on his phone. Gomez says the

pictures would have corroborated the story he told Trooper Sonstrom. And it would have explained why he was headed to Michigan with Silerio.

But Gomez's lawyer had sound reasons not to do so. Yes, on his phone Gomez had pictures of kitchen equipment. And the pictures were admitted into evidence—by the government. (*See* ECF No. 128, PageID.822–832.) The pictures were taken in October and November 2014, somewhere in Texas, and none of the equipment had any Michigan connections. (*Id.*) But the equipment did connect Gomez to a drug trafficker, and the government intended to make plain the connection if Gomez discussed the pictures at all. (*See* ECF No. 130, PageID.996–1000.) So Gomez's lawyer made a sound strategic and tactical choice not to mention the pictures, lest they do more harm than good.

At bottom, Gomez cannot establish deficient performance based on counsel's defense strategy. His lawyer adopted a sound strategy executed by way of reasonable tactical decisions. Gomez is not entitled to relief on this claim. Thus, the Court sees no need to address the prejudice factor.[2]

**B.**

Next Gomez turns to what he thinks was the prosecutor's decision to suborn perjury. Recall, once more, Denise Alvarado's testimony. Alvarado told the jury that Mendoza-Castillo had told her to expect a man named Mario to bring the drugs. And she said Mendoza-Castillo had showed her a picture of Gomez. But long before she testified, Alvarado had told an agent she had

---

[2] The Court does note, however, that Gomez has failed to satisfy this prong as well. He was one of two people in a car loaded with methamphetamine. There was testimony that the seller used two couriers. Gomez's cover story was not plausible. And his phone contained the intersection of the scheduled delivery location. So Gomez has not established a reasonable probability that the result at trial would have been different had his attorney objected and cross-examined as he thinks he should have.

no idea who was bringing the drugs to Michigan. And just prior to Alvarado's testimony, Mendoza-Castillo told the jury he had no idea who the couriers were. Thus, based on the inconsistent testimony, and Alvarado's inconsistent statements, Gomez thinks the government knew Alvarado was lying and pushed her to continue lying. So, says Gomez, the government suborned perjury in violation of due process.

"The 'deliberate deception of court and jury by the presentation of testimony known to be perjured' violates a defendant's due-process rights." *Monea v. United States*, 914 F.3d 414, 421 (6th Cir. 2019) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). To establish a due-process violation, Gomez must "show that the Government knowingly presented false testimony that materially affected the proceeding." *Monea*, 914 F.3d at 421 (citing *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)). To carry his burden, Gomez needs more than "mere inconsistencies in the testimony." *Id.* (internal quotations omitted).

Gomez cannot shoulder his burden. True, Alvarado changed her story and her testimony was inconsistent with Mendoza-Castillo's testimony. Mendoza-Castillo said one thing, Alvarado said the same thing prior to testifying, then she testified to something different. But inconsistencies are the only thing Gomez can point to. And "[m]ere inconsistencies in the testimony" is not enough to establish that Alvarado "testified in an indisputably false manner." *See Monea*, 914 F.3d at 421 (internal quotations omitted). Gomez is not entitled to relief on this claim.

## C.

Finally, Gomez says cumulative error warrants a new trial. Cumulative error means "the combined effect of individually harmless errors was so prejudicial" that it rendered Gomez's trial "fundamentally unfair." *United States v. Warman*, 578 F.3d 320, 349 (6th Cir. 2009). However, Gomez has not established any errors at his trial. So "there are simply no errors to cumulate."

*Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007) (en banc). So Gomez's claim fails. *Id.* And the Court need not consider the cumulative effect of the non-errors. *See United States v. Powell*, 444 F. App'x 517, 522 (3d Cir. 2011) ("Because we conclude there was no evidentiary or instructional error or prosecutorial misconduct, Powell's cumulative error claim also fails. The cumulative effect of each non-error does not rise to constitutional error; as the saying goes, zero plus zero equals zero."); *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990) ("[A] cumulative-error analysis should evaluate only the effect of matters determined to be in error, not the cumulative effect of non-errors."). Gomez is not entitled to relief on this claim.

**D.**

In sum, Gomez cannot establish a basis for granting his § 2255 motion. He received able assistance of counsel, he cannot demonstrate the government suborned perjury, and he has not established any errors to cumulate. So the Court DENIES Gomez's motion to vacate, set aside, or correct his sentence. (ECF No. 164.) Nor is Gomez entitled to a certificate of appealability. A certificate of appealability must issue before Gomez may appeal "the final order in a proceeding under section 2255." 28 U.S.C. § 2253(c)(1)(B). In order to receive a certificate of appealability, Gomez must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). But for the reasons explained above, Gomez has not done so.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Date: August 23, 2019

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on August 23, 2019.

s/William Barkholz
Case Manager to
Honorable Laurie J. Michelson